**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| 9306609 CANADA INC., a Canada corporation, | § § § | |
| Plaintiff, | § § | Civil Action No.1:21-CV-00872 |
| v. | § § | |
| ALI I. JABR, | § § | |
| Defendant. | § § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff 9306609 Canada Inc., a Canada corporation (**"Plaintiff"** or **"Dresden Canada"**), for its complaint against Ali I. Jabr (**"Mr. Jabr"** or **"Defendant"**), respectfully shows this Court as follows:

**The Parties**

1.      Plaintiff 9306609 Canada Inc. is a Canadian corporation organized and existing under the laws of the Dominion of Canada with its principal place of business in Brampton, Ontario, Canada.

2.      Defendant Ali I. Jabr is an individual and a citizen of the State of Texas who may be served at his residence:  2277 Fernspring Dr., Round Rock, Texas 78665, or anywhere else that he may be found.

### Related Parties

3.     GA Auto Group, Inc. ("**GA Auto Group**") is a Texas corporation in the business of trading previously owned automobiles.  It is owned and controlled by Defendant Ali I. Jabr.

4.     Mohamed El-Khodiry is an individual and dual citizen of Canada and the United States.  Until May 2021, he was an employee of Dresden Canada.

### Jurisdiction

5.     This Court has original jurisdiction over this action or proceeding to grant relief pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.     This Court may exercise personal jurisdiction over Defendant Ali I. Jabr because he is a citizen of and is domiciled in the State of Texas.

### Venue

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) as Defendant Ali I. Jabr resides within this judicial district, and further because a substantial part of the events and/or omissions giving rise to the claim occurred within this judicial district.

### Factual Background

8.     This action arises from the misappropriation by Defendant Ali I. Jabr of millions of dollars properly belonging and owed to Dresden Canada, an affiliate based in Ontario, Canada of Dresden Motors, LLC ("**Dresden Motors**"), a Dubai, United Arab Emirates Free Zone Limited Liability Company dealing primarily in new and previously

owned luxury automobiles.  While employed by Dresden Canada until May 2021, Mr. El-Khodiry acted at Mr. Jabr's direction to facilitate Mr. Jabr's misappropriation of those funds.

9.      Mr. Jabr's misappropriation of those funds properly belonging and owed to Dresden Canada was made possible by an arrangement on its behalf between Dresden Canada's principal Sohaib Al-Sammarraie, on the one hand, and Mr. Jabr and Mr. El-Khodiry, on the other, to establish and operate an entity in the United States to engage in the business of buying and selling previously owned luxury automobiles.

10.     Mr. Jabr was introduced to Mr. Al-Sammarraie in 2017 through Mr. El-Khodiry, whom Dresden Canada had employed since at least September 2016.[1]

11.     Mr. El-Khodiry represented that Mr. Jabr had experience in luxury car sales and recommended to Mr. Al-Sammarraie that Dresden Canada collaborate with Mr. Jabr on sourcing and selling previously owned luxury vehicles.

12.     Based on Mr. El-Khodiry's endorsement, Dresden Canada entered into an oral agreement with Mr. Jabr under which Mr. Jabr would source previously owned luxury vehicles in the United States for ultimate sale through Dresden Motors to overseas buyers. In exchange for vehicles that Dresden Motors procured through him, it would pay Mr. Jabr a commission of $1,500 per vehicle.  Payment was made upon acquisition of the vehicle by Dresden Motors and was not contingent on a subsequent sale of the vehicle to the

---

[1] The full extent of the business and personal relationship between Mr. Jabr and Mr. El-Khodiry is unknown. But, on information and belief, they are and have been doing business with one another in a variety of ways, including but not limited through Cargo America, Inc., a Texas-based business owned by Mr. Jabr in which Mr. El-Khodiry holds a management role.

ultimate overseas retail buyer.

13.     In early 2018, Mr. Al-Sammarraie, Mr. El-Khodiry, and Mr. Jabr began discussing establishing a United States-based entity to sell in the United States luxury vehicles sourced abroad by Dresden Motors on behalf of Dresden Canada.  Eventually, the three reached an oral agreement (with Mr. Al-Sammarraie acting on behalf of Dresden Canada) to form a business together for that purpose.

14.     At all relevant times, Mr. Al-Sammarraie acted as principal for and on behalf of Dresden Canada in negotiations preceding and resulting in the parties' oral agreement.

15.     Mr. Jabr participated in these negotiations from and consummated this agreement in Texas, where he resides and where his business GA Auto Group is based and operates.

16.     Under the terms of the parties' agreement, Mr. Jabr and Mr. El-Khodiry would (among other things) form an Oregon limited liability company to be called Sahara Tours, LLC (**"Sahara Tours"**) in their own names as nominees for the benefit of Dresden Canada.  Because Sahara Tours would be established and operated for the benefit of Dresden Canada, all of the expenses necessary to establish, operate, and procure vehicle inventory for Sahara Tours would be provided by Dresden Canada—either directly on its own or indirectly through Dresden Motors (pursuant to a separate arrangement for that purpose between Dresden Canada and Dresden Motors).

17.     Regarding how the business would be run, it was agreed:  (a) that Mr. Jabr and Mr. El-Khodiry generally would perform the day-to-day operations of Sahara Tours subject to Mr. Al-Sammarraie's direction and approval on behalf of Dresden Canada of all

major decisions and expenses; (b) that, once established and operating, Sahara Tours would sell luxury vehicles in the United States as a consignee of Dresden Canada, which would acquire abroad (through Dresden Motors) vehicles for Sahara Tours' inventory; (c) that Mr. El-Khodiry would perform his responsibilities and be compensated as part of his ongoing employment with Dresden Canada; and (d) that upon each vehicle sale, Dresden Canada (directly or indirectly through Dresden Motors, subject to their own separate arrangement) would pay a commission to Mr. Jabr for any sales that he procured, similar to the basis on which Mr. Jabr had been earning commissions in his previous course of dealing with Dresden Canada and Dresden Motors.[2]

18.     Dresden Canada (through Mr. Al-Sammarraie) agreed to this arrangement based on representations to Mr. Al-Sammarraie that, because he and the company are not United States persons, neither Mr. Al-Sammarraie, individually, nor Dresden Canada were legally permitted to be named as owners of Sahara Tours.

19.     Thus, Dresden Canada (through Mr. Al-Sammarraie) agreed with Mr. Jabr and Mr. El-Khodiry that each of them rather than Mr. Al-Sammarraie or Dresden Canada would be the listed members and/or managers of Sahara Tours as nominees for Dresden Canada, whose ownership of Sahara Tours would be undisclosed.

20.     In March 2018, on a parallel track with establishing Sahara Tours, and in reliance on the parties' agreement, Dresden Motors acquired in Dubai—at Dresden Canada's request and direction for purposes of selling them on consignment through Sahara Tours—two (2) 2018 Mercedes Maybach G650s (VINs: WDB4632741X290088

---

[2] Dresden Motors is owned and operated by two brothers of Mr. Al-Sammarraie.

and WDCYC7EF5JX279173) (the **"G650s"**) at a cost of $1,076,295 for each of the vehicles (a total cost of $2,152,590).

21.    A photograph of the G650s appears below.



22.    Effective April 17, 2018, consistent with the arrangement to which they had agreed with Dresden Canada, Mr. Jabr and Mr. El-Khodiry filed Articles of Organization with the Oregon Secretary of State to establish Sahara Tours.

23.    As agreed and anticipated, the Articles of Organization listed only Mr. Jabr and Mr. El-Khodiry as Sahara Tours' members, with Mr. El-Khodiry as the registered agent, and make no reference to Mr. Al-Sammarraie, Dresden Canada, or Dresden Motors.

24.    Along with having ultimate management authority for Sahara Tours,

Dresden Canada funded Sahara Tours through Dresden Motors.[3]  Neither Mr. Jabr nor Mr. El-Khodiry provided any funding to establish or to operate Sahara Tours.

25.     Based on the parties' agreement, Dresden Canada planned for the G650s to be the first vehicles transferred to Sahara Tours and sold on consignment in the United States.  Other pre-owned luxury cars would then follow to provide inventory for Sahara Tours, at whatever pace might be justified by the ability to procure the vehicles abroad and the demand for them by U.S. buyers.

26.     Under the consignment-sale arrangement that was part of the agreement among Dresden Canada (through Mr. Al-Sammarraie), Mr. El-Khodiry, and Mr. Jabr, no cash changed hands when possession of any vehicles procured overseas was transferred from Dresden Motors through Dresden Canada to Sahara Tours for sale by consignment in the United States.  Instead, an obligation by Sahara Tours (as the consignee) to pay Dresden Canada (as consignor) would arise if or when the vehicles were sold to an ultimate buyer.  The amount due and owing (and to be remitted) from Sahara Tours to Dresden Canada would be the amount for which the vehicles were sold to the ultimate retail buyers, less a consignment fee retained by Sahara Tours, which would distribute the consignment fee to Mr. Jabr as his commission.

27.     In September 2019, Mr. Al-Sammarraie coordinated with his cousin Okba Al-Sammarraie (**"Okba"**) and Mr. El-Khodiry to effect transferring the G650s on behalf of

---

[3] Subject to its separate agreement with and on behalf of Dresden Canada, Dresden Motors paid for all expenses incurred by Sahara Tours including, but not limited to, commercial rent, dealer licensure fees, airfare between Canada and Oregon for Mohamed, and airfare between Austin and Oregon for Ali.

Dresden Canada from Dresden Motors to Sahara Tours and shipping them to the United States for sale by consignment.

28.     As part of this process, Dresden Motors on behalf of Dresden Canada first engaged and paid G&K Automotive Conversion, Inc. (**"G&K"**) to provide conversion services for the G650s to make them eligible for import to and sale in the United States.

29.     Dresden Motors then prepared a consignment-sale invoice for each of the G650s to Sahara Tours.  As agreed, based on the consignment-sale arrangement for the foreign-procured vehicles in which it would be dealing on Dresden Canada's behalf, Sahara Tours did not owe payment of any amount to Dresden Motors or Dresden Canada for the G650s because Sahara Tours would be selling them on consignment to their ultimate retail buyers.

30.     In connection with shipping the G650s from Dubai to the U.S., Okba and Mr. El-Khodiry (both of them at Dresden Canada's direction and the latter in his capacity as a Dresden Canada employee) procured an insurance policy for the G650s through State Farm Mutual Automobile Insurance Company (**"State Farm"**) under which the vehicles were comprehensively insured.  Okba paid the premium for the State Farm policy on behalf of Dresden Canada.  Importantly, Mr. El-Khodiry represented to Mr. Al-Sammarraie that only a U.S. resident could be an insured under the State Farm policy and that, in any event, making the insured a U.S. resident supposedly would minimize or avoid regulatory issues with the U.S. Department of Transportation when the G650s were imported.

31.     Accordingly, Mr. El-Khodiry represented to State Farm and to the insurance broker through which the insurance policy was procured that Mr. Jabr would be the

insured under the State Farm policy.

32.     Other than under the State Farm policy, Sahara Tours was identified throughout the import process as the owner of the G650s because, as intended, Sahara Tours would be responsible for selling the vehicles in the United States directly or through an intermediary on a consignment basis to their ultimate buyers.

33.     On December 3, 2019, the G650s arrived in California from Dubai and were delivered to G&K's warehouse for completion of the required conversions necessary to make the vehicles eligible for sale and use in the U.S.  These conversion services cost more than $200,000, which Dresden Motors paid on behalf of Dresden Canada.

34.     The G650s were stored in G&K's warehouse until the conversion services were complete and were then transported to be shown and sold on consignment by Dresden Canada through iLusso—a Costa Mesa, California luxury vehicle consignment dealership.

35.     On a parallel track, title documents from the State of Oregon for the G650s were generated at Mr. Jabr's direction and identified Sahara Tours as the owner of the G650s.  The Oregon title documents were delivered to GA Auto Group at its offices in Round Rock, Texas.

36.     Unfortunately, due to the Covid-19 pandemic, iLusso was unable to show and therefore also was unable to sell the G650s and began arranging to return the vehicles to Dresden Canada through Okba's company, Sama California Auto Export, Inc. (**"<u>Sama California</u>"**), located in La Palma, California, which would maintain custody of the G650s temporarily on behalf of Dresden Canada.

37.     In early July 2020, Mr. Jabr suggested transporting the G650s to Austin, Texas (where he resides) for sale in exchange for a commission.  Mr. Al-Sammarraie agreed on behalf of Dresden Canada and left the details of transporting the vehicles in Mr. Jabr's hands.

38.     To transport the G650s, Mr. Jabr hired Reliable Carriers Inc. (**"Reliable"**), a Michigan corporation, to ship the vehicles by truck from California to Texas. Reliable was insured and bonded.

39.     On July 5, 2020, the truck transporting the G650s caught fire, severely damaging the G650s as a result.

40.     A photograph of fire damage to the trailer of the truck that transported the G650s appears below.



41.     A photograph of fire damage to one of the G650s appears below.



42.     Mr. Jabr contacted Reliable to make a claim under its policy of insurance for the replacement cost of the G650s; but Reliable was slow to respond and, rather than paying for the value of the G650s, insisted on attempting to clean and inspect the vehicles for purposes of making repairs and (if necessary) replacing damaged parts.

43.     Frustrated with Reliable's response, Mr. Al-Sammarraie directed Mr. Jabr and Mr. El-Khodiry to submit a claim under the State Farm policy.

44.     On July 14, 2020, Mr. Jabr at Mr. Al-Sammarraie's direction submitted a claim to State Farm for the loss related to the damage to and destruction of the G650s.

45.     Purportedly to substantiate the claim under the State Farm policy, Mr. Jabr arranged to transport the G650s to Mercedes Benz of Austin ("**MBA**") to inspect and provide a report on the damage to the vehicles.  MBA prepared a report for which Mr. Jabr paid and was reimbursed by Dresden Motors on behalf of Dresden Canada pursuant to the separate arrangement between them.  The MBA report stated that while the engines

of the G650s could start, "many exterior features and body parts melted" and "the condition and integrity of the body and frame could not be determined due to exposure of EXTREME temperatures while in shipment container fire."  The MBA report also stated that "[w]ith the extreme heat the vehicle endured it is unknown what the life expectancy of any remaining items" would be, "repairs on this vehicle would be difficult to warrant if not impossible due to the damage," and that MBA "would not perform any repairs on this vehicle due to the nature of its condition."

46.     Further complicating any potential repair, necessary replacement parts were not likely to be available due to the rarity of these vehicles, of which only 99 were ever manufactured.  Indeed, the MBA report confirmed that because the vehicles are "mostly hand built and one of a kind[,] gathering parts might be nearly impossible if not very[,] very time consuming."

47.     State Farm accordingly declared each of the G650s to be a total loss and proceeded toward making payment on the claim under the State Farm policy that covered the vehicles.

48.     On July 22, 2020, as he had done for all expenses related to the Sahara Tours business venture among the parties, Mr. Jabr invoiced Dresden Motors through GA Auto Group for the reimbursement of expenses relating to the G650s after the truck fire. This reimbursement included expenses for: vehicle towing, diagnostic reports, a printer, taxes, and "gifts" of $4,000.

49.     As was customary for all expenses incurred by Sahara Tours or Mr. Jabr relating to the G650s, Dresden Motors paid the reimbursement invoice on behalf of

Dresden Canada in the ordinary course of business.  Mr. Al-Sammaraie, however, did not review or approve the reimbursement request before payment.

50.      In October 2020, State Farm paid the claim for the loss of the G650s in the amount of $2.6 million to Mr. Jabr, who was the named insured under the State Farm policy.  Mr. Jabr delayed advising but eventually confirmed to Mr. Al-Sammarraie that he had received $2.6 million in proceeds from the State Farm policy for the loss of the G650s.

51.      Expecting to promptly receive the insurance proceeds for the G650s that State Farm had paid to Mr. Jabr—because Dresden Motors had paid the policy premium on behalf of Dresden Canada through Okba—Mr. Al-Sammarraie made repeatedly unsuccessful attempts to reach Mr. Jabr about remitting the State Farm policy proceeds to Dresden Canada.

52.      Mr. Jabr ignored Mr. Al-Sammarraie until, finally, Mr. Jabr responded that he was withholding the insurance proceeds from Dresden Canada for at least three reasons: (1) for reimbursement of a $400,000 cash "gift" Mr. Jabr claimed he needed to make to Bryan Hardeman, the owner of MBA; (2) to pay himself and Mr. El-Khodiry hundreds of thousands of dollars in fees for their services; and (3) to have the proceeds available in the event that State Farm sought to recoup them.

53.      The last of these alleged reasons for withholding the State Farm policy proceeds made the least sense, since State Farm had not given any indication that it had improperly paid the claim.  Nevertheless, Mr. Jabr insisted it was true.

54.      Mr. Jabr further explained to Mr. Al-Sammarraie that he needed the $400,000 to make a "gift" or some kind of bribe to Bryan Hardeman because Mr.

Hardeman had threatened Mr. Jabr with violence during a visit to Mr. Hardeman's ranch unless Mr. Jabr paid him $400,000 in connection with or in return for helping to get State Farm to declare the G650s a total loss.

55.     Mr. Al-Sammarraie responded by demanding that Mr. Jabr immediately transfer the State Farm policy proceeds to Dresden Canada.

56.     Mr. Jabr ignored Mr. Al-Sammarraie's demand and continued to withhold the $2.6 million in State Farm policy proceeds, repeating the same reasons for withholding them.

57.     On November 24, 2020, without notice or explanation, Mr. Jabr transferred $200,000 to Dresden Canada but continued to retain the remaining $2.4 million balance of the State Farm policy proceeds.

58.     In communications around that time between them, Mr. Jabr represented to Mr. Al-Sammarraie that Mr. Jabr remained concerned that State Farm would seek to recoup the policy proceeds and indicated that he had reason to believe that there was a significant risk of such a clawback attempt.   Mr. Jabr accordingly advised Mr. Al-Sammarraie that Mr. Jabr would release the remaining policy proceeds only if Mr. Al-Sammarraie executed some kind of an "agreement" under which Mr. Al-Sammarraie would commit to certain confidentiality obligations, accept payment totaling only $1.8 million instead of the remaining $2.4 million, and indemnify or defend Ali against any future claims made by State Farm or others involving the policy proceeds.

59.     On or about February 17, 2021, while still out of pocket roughly $2 million for the G650s for more than two years, unable to travel to the U.S. to communicate in

person with Mr. Jabr due to pandemic-related restrictions, in justifiable reliance on the various representations on Mr. Jabr made for withholding the State Farm policy proceeds—and, further, being told by Mr. Jabr that his terms were non-negotiable—Mr. Al-Sammarraie signed a written "agreement" under which (among other things) Mr. Jabr conditionally promised to remit to Dresden Canada $1.8 million from the remaining $2.4 million in State Farm policy proceeds under certain circumstances, including but not limited to the resolution of some kind of an alleged subrogation dispute or proceeding between State Farm and Reliable.

60.    But instead of then remitting $1.8 million to Dresden Canada, Mr. Jabr refused to make any additional payments.  He instead advised Mr. Al-Sammarraie that he believed that his bank account would be closed automatically for international money transfers if he made any payments to Dresden Canada's or Mr. Al-Sammarraie's personal Canadian bank account.

61.    From March through April 2021, Mr. Jabr then made three separate transfers of $150,000 each over roughly three weeks and a final transfer of $50,000 to a U.S. bank account held by Sama California.

62.    Then, in clear repudiation of the "agreement" that had been signed the previous month, Mr. Jabr notified Mr. Al-Sammarraie that he would not transfer the remaining balance of $1.1 million of the $1.8 million that he had represented he would promptly remit.[4]  Instead, Mr. Jabr advised that he only would transfer $50,000 every other

_____

[4] Dresden Canada denies that the February 2021 "agreement" is or ever was enforceable because, among things, Mr. Al-Sammarraie was fraudulently induced to sign it and it imposes no unconditional obligations on Mr. Jabr.  Additionally, regardless of its

week until he had remitted $1.8 million of the State Farm policy proceeds.  At that rate, Dresden Canada would not receive the promised $1.8 million for roughly another year.

63.     On Mr. Jabr's clear repudiation of the (unenforceable) "agreement" the parties had signed the previous month, Mr. Al-Sammarraie rejected Mr. Jabr's diktat that he only would remit further State Farm policy proceeds in $50,000 bi-weekly transfers and insisted that Mr. Jabr immediately remit payment in full.

64.     Mr. Jabr responded that he would do so if and only if Mr. Al-Sammarraie agreed to execute a lien on Mr. Al-Sammarraie's residence in Canada.  Frustrated with what had become a nearly year-long pattern of delays and misrepresentations, Mr. Al-Sammarraie advised Mr. Jabr that he (acting on behalf of Dresden Canada) would not negotiate any further, that Dresden Canada would not accept anything less than full payment of all the State Farm policy proceeds, and that Mr. Jabr immediately must pay the remaining unpaid balance of those proceeds totaling $1.9 million.

65.     At around the same time, without notice or explanation, Mr. El-Khodiry resigned from his employment with Dresden Canada.  Mr. Al-Sammarraie acknowledged Mr. El-Khodiry's resignation but asked him to assist with resolving the ongoing dispute with Mr. Jabr about remitting the State Farm policy proceeds to Dresden Canada.  Mr. El-Khodiry failed and refused to cooperate further in recovering the State Farm policy proceeds from Mr. Jabr for Dresden Canada.

66.     In subsequent meetings with third parties, Mr. Jabr has admitted that the

---

enforceability, the February 2021 "agreement" includes neither a release nor an integration clause.

G650s belonged to Dresden Canada, and has repeated the representations that he made (i.e., the reasons he had given) to Mr. Al-Sammarraie for refusing to remit the full amount of the State Farm policy proceeds—which representations concerned Mr. Jabr's purported belief that State Farm would seek to recoup them, that State Farm had a basis for doing so, and that a portion of the proceeds would be owed to or demanded by Bryan Hardeman and/or MBA in connection with the damage report that it provided for the G650s.

67.    On information and belief, there has never been a likelihood of or even an objective basis for State Farm seeking to recoup the policy proceeds from Mr. Jabr, nor did MBA, any employees or representatives of MBA, or Bryan Hardeman, individually, require of, demand from, or even receive from Mr. Jabr gifts or payments in connection with preparing the report in which MBA advised that the G650s were irreparable and a total loss.

## Causes of Action

**Count 1:    Breach of Contract**

68.    Plaintiff re-alleges and incorporates by reference ¶¶ 1-67 as if fully set forth herein.

69.    As set forth in more detail above, Plaintiff entered into a valid and enforceable contract with Mr. Jabr under which, among other things, he and Mr. El-Khodiry would establish and act as nominee owners of Sahara Tours at the direction (through Mr. Al-Sammarraie) and for the benefit of Dresden Canada and receive compensation in the form of commissions on vehicle sales for Mr. Jabr and continued

employment and salary from Dresden Canada for Mr. El-Khodiry (the **"<u>Agreement</u>"**).

70.     Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations under the Agreement.

71.     Defendant materially breached the Agreement by, among other things, failing to remit the State Farm policy proceeds to Dresden Canada.

72.     As a natural, probable, and foreseeable consequence of Defendant's continuing breach of the Agreement, Plaintiff has suffered injury and damage (including but not limited to direct damages in the amount of the State Farm policy proceeds and lost profits) in an amount to be determined by the trier-of-fact exceeding the minimum jurisdictional limits of this Court.

**Count 2:     Breach of Fiduciary Duty**

73.     Plaintiff re-alleges and incorporates by reference ¶¶ 1-72 as if fully set forth herein.

74.     Pursuant to and in connection with the Agreement, Sahara Tours, and the G650s, Mr. Jabr was acting as an agent of Dresden Canada (which beneficially owned Sahara Tours and for whose benefit Mr. Jabr provided services in exchange for commission payments under the Agreement) and, as such, had a formal fiduciary relationship with Dresden Canada.

75.     The fiduciary duties owed by Mr. Jabr to Dresden Canada as a result of that formal fiduciary relationship include, among other things, (1) the duty of loyalty and utmost good faith; (2) the duty of candor; (3) the duty to refrain from self-dealing; (4) the duty to act with integrity of the strictest kind; (5) the duty of full disclosure; and (6) the duty of fair

and honest dealings.

76.     Mr. Jabr breached his fiduciary duties to Plaintiff by, among other acts and omissions, knowingly abusing his position as a nominal member and manager of Sahara Tours for his personal benefit and to the detriment of Plaintiff.  Such abuse of Mr. Jabr's position includes, among other things, submitting bogus reimbursement requests and withholding and failing and refusing to remit the State Farm policy proceeds to Dresden Canada.

77.     As a result of the breaches of fiduciary duty to Plaintiff by Mr. Jabr, Plaintiff has suffered damages and/or Mr. Jabr has wrongfully obtained benefits which must be disgorged in an amount exceeding the minimum jurisdictional limits of this Court, to be determined by the trier-of-fact.

**Count 3:       Common Law Fraud**

78.     Plaintiff re-alleges and incorporates by reference ¶¶ 1-77 as if fully set forth herein.

79.     To induce Plaintiff to allow Mr. Jabr to procure the State Farm policy and to pay the policy premium with Dresden Canada's funds but naming himself as the insured; to induce Plaintiff to defer seeking recovery of the full amount of the State Farm policy proceeds for the loss of the G650s; to induce Plaintiff to negotiate the extent of those proceeds that Mr. Jabr would remit to Plaintiff; and to misappropriate hundreds of thousands of dollars from the State Farm policy proceeds that he continues to withhold from Dresden Canada, Mr. Jabr made material representations that he knew to be false at the time they were made or, alternatively, made those representations recklessly

without any knowledge of the truth.  The representations were made with the intent that Plaintiff (through Mr. Al-Sammarraie) act on them.

80.     In reasonable and justifiable reliance on these materially false representations, Plaintiff acted on them by, among other things, allowing Mr. Jabr to procure the State Farm policy in his name as the insured using Dresden Canada funds to pay the policy premium; forgoing immediate action to recover the full amount of the State Farm policy proceeds; and negotiating with Mr. Jabr to remit only $1.8 million instead of the full $2.6 million that Mr. Jabr had received from State Farm.

81.     As a direct and proximate result, Plaintiff has suffered damages in an amount exceeding the minimum jurisdictional limits of this Court, to be determined by the trier-of-fact.

**Count 4:     Money Had and Received against Defendant Ali I. Jabr**

82.     Plaintiff re-alleges and incorporates by reference ¶¶ 1-81 as if fully set forth herein.

83.     As a result of the claim under the State Farm policy for loss of the G650s while being transported by Reliable from California to Texas, Mr. Jabr received an identifiable sum of money that he has wrongfully withheld from Dresden Canada— specifically, the remaining balance of the State Farm policy proceeds.

84.     These monies rightfully, in equity and good conscience, belong to Plaintiff, because Plaintiff was the owner of the property (i.e., the G650s) insured under the State Farm policy, for whose benefit the State Farm policy was procured, and with whose funds the premium for the State Farm policy was paid.

85.     Mr. Jabr accordingly must remit to Plaintiff any remaining balance of the State Farm policy proceeds in his possession, custody, or control.

**Count 5:      Unjust Enrichment against Defendant Ali I. Jabr**

86.     Plaintiff re-alleges and incorporates by reference ¶¶ 1-85 as if fully set forth herein.

87.     The State Farm policy proceeds that Mr. Jabr misappropriated by failing and refusing to remit them in full to Dresden Canada constitute a benefit he obtained from Dresden Canada through fraud, duress, or the taking of undue advantage.  Mr. Jabr has therefore wrongfully secured a benefit or has passively received one, and it would be unconscionable for him to retain it because the State Farm policy proceeds reflect the loss of the G650s to Dresden Canada.

88.     Mr. Jabr is therefore required to disgorge to Plaintiff any remaining balance of the State Farm policy proceeds in his possession, custody, or control.

<u>**Exemplary Damages**</u>

89.     Plaintiff re-alleges and incorporates by reference ¶¶ 1-88 as if fully set forth herein.

90.     Because Defendant acted with malice, fraud, and/or gross negligence, Plaintiff is entitled to recover from Defendant, in addition to Plaintiff's actual and compensatory damages, exemplary damages in an amount exceeding the minimum jurisdictional limits of the Court, to be determined by the trier-of-fact.

91.     Plaintiff reserves its rights to amend and address the applicability of any provisions under Texas law that waive any limits on the award of exemplary damages,

including for the misapplication of fiduciary property.

## Conditions Precedent

92.     All conditions precedent to the foregoing causes of action have been performed, have been excused, have occurred, or have been waived, and Plaintiff has fully or substantially performed all acts necessary to perfect and establish all claims and causes of action asserted in this action.

## Attorneys' Fees

93.     In order to protect and enforce its rights, Plaintiff has engaged the services of the undersigned attorneys and has agreed to pay them a reasonable fee for their services.

94.     Plaintiff accordingly seeks and is entitled to recover reasonable and necessary attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code, and/or other applicable provisions of Texas law including, but not limited to any appeals, and post-judgment collection of any judgment in Plaintiff's favor.

## Prayer for Relief

95.     WHEREFORE, Plaintiff 9306609 Inc. asks that Defendant Ali I. Jabr be cited to appear and answer and, on final hearing, that Plaintiff have judgment against Defendant for all amounts recoverable under any applicable law and/or contract for actual, incidental, consequential, general, special, and exemplary damages, disgorgement of benefits, pre- and post-judgment interest at the highest rates permitted by law, attorneys' fees and costs at the trial and appellate levels, as well as all other relief at law or in equity to which Plaintiff may be justly entitled.

Dated:  September 29, 2021                    Respectfully submitted,

                                              **SOLTERO SAPIRE MURRELL PLLC**

By:_____
                    Gregory P. Sapire
                    Texas State Bar No. 00791601
                    greg@ssmlawyers.com
                    Carlos R. Soltero
                    Texas State Bar No. 00791702
                    carlos@ssmlawyers.com
                    Vanessa Alejandra Suarez
                    Texas State Bar No. 24118548
                    vanessa@ssmlawyers.com

                    7320 N. MoPac Expy.
                    Suite 309
                    Austin, Texas 78731-2311
                    (512) 431-9518 Telephone
                    (512) 359-7996 Facsimile

                    **ATTORNEYS FOR PLAINTIFF**
                    **9306609 CANADA INC.**